## CHAMPLIN v. COMMISSIONER OF INTERNAL REVENUE.

No. 1207.

Circuit Court of Appeals, Tenth Circuit.

Aug. 22, 1935.

906

Harry O. Glasser, of Enid, Okl., for petitioner.

Warren F. Wattles, Sp. Asst. to Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before PHILLIPS, McDERMOTT, and BRATTON, Circuit Judges.

McDERMOTT, Circuit Judge.

The background of the controversy now for decision will be found in (C. C. A.) 71 F.(2d) 23. This installment deals with the allowances made petitioner for depletion of the oil reserves giving rise to the income taxed in 1918, 1919, and 1920. In 1926, after elaborate computations, the Commissioner valued the oil reserves and the lease. His figures as to intrinsic values are not now and never have been disputed. Petitioner's title to the lease had been in serious litigation since 1916, but was ultimately vindicated in 1924. Despite the litigation, petitioner and his wife remained in possession and developed the property, producing large quantities of oil the proceeds of which were returned for taxes undiminished by the title hazard. In 1920 petitioner and his wife incorporated their holdings but retained their stock. The Commissioner assessed a tax on the gain found by him to have accrued by exchanging their lease for stock; in arriving at the "fair market value" of stock received in exchange for the lease under 202 (b), Revenue Act of 1918, 40 Stat. 1060, the Commissioner deducted 25 per cent. for the title hazard. In arriving at "fair market value of the property" for depletion under 214 (a) (10) of the same act (40 Stat. 1066, 1067), he valued the product—the oil producing the income —without diminution on account of the flaw in the title to the lease. When the Commissioner arrived at these two valuations on the same day, the one taking into account title hazard and the other not, it was doubtless done on the theory that in the one case he was concerned with what the stock might be sold for on a fair market, and in the other with the value of the product giving rise to the income taxed.

The petitioner challenged the Commissioner's assessment of a tax upon gain found to have accrued from the act of incorporation, contending that there was no market for the stock or the lease because of the litigation over the title. The Commissioner did not invoke the jurisdiction of the Board to increase the deficiency (26 USCA 2272 (e) because he had not depreciated discovery value by the title hazard; he did plead in the alternative that if his valuation of the stock under the exchange section was lowered by the Board, a corresponding reduction should be made in his valuation of the oil reserves for depletion.

The Board sustained the Commissioner's assessment on the gain supposedly accruing from the act of incorporation. In the absence of any prayer to increase the deficiency, it was not then called upon to pass upon the alternative issue. This court then held that the proof was conclusive and undisputed that there was no market for the stock. Upon remand, the Commissioner called upon the Board to decide the alternative issue. The Board did decide it upon the record in the main case. Its decision was (1) that under the doctrine of the "law of the case," the decision of this court that the stock had no market value under the exchange section of the statute was conclusive on the question of the discovery value of the lease for purpose of depletion; and (2) that, as a fact, the lease had no "fair market value" upon which a discovery value for depletion could be computed under section 214 (a)

(10), Revenue Act of 1918, 40 Stat. 1066, 1067. A deficiency was adjudged in petitioner's income tax for 1918 of $254,282.85; for 1919 of $135,341.63; and for 1920 of $11,397.76. It is this judgment which we now review.

From this synoptic statement it will be seen that an important, and apparently hitherto undecided, question is presented: Where a taxpayer is required to return for taxation the entire proceeds of oil produced, undiminished by a title hazard, is he entitled to the statutory depletion allowance likewise undiminished?[1]

■ Both sides present, with vigor spiced at times with rancor, reasons why the other is precluded from asking that the case be decided on its merits. Petitioner contends that the Commissioner is estopped by a stipulation entered into at the former trial that the Commissioner did, in 1926, allow and petitioner did accept the specific sums for depletion now found by the Board to be erroneous—a stipulation expressly reciting that in making such allowance the Commissioner did not consider the title hazard. The Board, when its jurisdiction is properly invoked, has power to revise legal errors of the Commissioner whether they be for or against the taxpayer; no estoppel arises from stipulating the facts which present the legal question.

■ Petitioner then contends that by failure of the Commissioner to cross-appeal from the first decision of the Board, or to assign cross-error, or to petition our court for rehearing, the tax liability is adjudicated, or that the doctrine of the law of the case precludes further inquiry. But the Commissioner prevailed before the Board on the first hearing. There was nothing from which he could appeal nor to which error could be assigned. When this court reviews decisions of the Board of Tax Appeals, we do not act as a trial court. Even if so requested by the Commissioner, we could not and would not have tried the alternative issue not decided by the Board. If the Commissioner's contention now made—that depletion allowance depends upon defects in title to the lease—is sound, the procedure followed was correct. The value of the stock depended, in part, upon the value of the lease; the title hazard of the lease was one of the reasons why the stock was not marketable, and was constant during all the times here involved. The pleadings presented a simple case of an alternative issue, a prayer that if the Commissioner's determination of the value of the stock was reduced, that then a corresponding reduction should be made in the value of the lease back of the stock. The Board having sustained the Commissioner's first contention was never confronted with the second. When this court reversed the Board, it was confronted for the first time with the alternative issue. This court decided nothing as to depletion, so the Board was free to act. Hartford Life Ins. Co. v. Blincoe, 255 U. S. 129, 41 S. Ct. 276, 65 L. Ed. 549. The question now presented at great length by petitioner, was not even mentioned in petitioner's voluminous briefs on the first appeal; respondent, in one brief paragraph, mentioned it only in passing. If this court had noticed it in the first opinion, it would have been only to remand that issue to the Board for determination. Helvering v. Taylor, 293 U. S. 507, 55 S. Ct. 287, 79 L. Ed. 623; Helvering v. Rankin, 295 U. S. 123, 55 S. Ct. 732, 79 L. Ed. ——.

■ Respondent, on the other hand, insists that petitioner is estopped to contend

---

[1] This clear-cut issue has been beclouded, our task made more burdensome and decision delayed by an array of briefs and supplemental transcripts, many filed without consent. The file consists of

(1) Record, 337 pages
(2) Petitioner's brief, 140 pages
(3) Respondent's brief, 41 pages
(4) Reply brief, 41 pages
(5) Supplemental brief for respondent, 11 pages
(6) Petitioner's reply to supplemental brief for respondent, 27 pages
(7) Respondent's rejoinder to petitioner's latest reply brief, 6 pages
(8) Petitioner's supplemental transcript of proceedings before Board
(9) Respondent's supplement to supplemental transcript, 63 pages
(10) Petitioner's supplemental exhibit, being record in 35,813, Champlin Refining Company v. Commissioner, 71 pages
(11) Petitioner's supplemental exhibit, record, and all briefs in Buttolph v. Commissioner
(12) Letters from the parties to the clerk advancing arguments as they occurred to counsel. Such letters are not listed; this opinion will not be filed for several days and the file is doubtless not yet complete.

that the lease had a discovery value in 1916 because he established that the stock received in 1920 had no market value because the lease was in litigation; petitioner, respondent says, has evaded a tax on the exchange by denying what he now asserts. But petitioner has evaded no tax; our holding that no taxable gain arose from incorporation resulted in no tax evasion; when and if the petitioner or his wife dispose of their stock, the gain will then be taxable, and apparently at much higher rates, so that in the end the tax paid will doubtless be much greater than if a tax had been collected, at lower rates, on the mythical gain found by the Commissioner and the Board to have resulted from the mere fact of incorporation. The suggestion in respondent's brief and in the Board's opinion that our decision that the stock had no market value in 1920 is the law of the case on discovery value in 1916 is as erroneous as petitioner's argument on the same doctrine. Respondent's contention is based upon the assumption that market value of the stock in 1920 is the same question as discovery value in 1916; but that assumption is the very nub of the case. The point becomes immaterial however, because the proof supports the Board's finding that there was no fair market for the lease on the discovery dates because of the title hazard. If, therefore, defects in title to the lease must be appraised, and if no depletion is allowable if there is no fair market for the lease, the petition to review must be denied.

■ Coming then to the merits: The Commissioner's basic findings of discovery values of the lease are not challenged. The Board struck down his depletion allowances because petitioner's title to the property was in litigation and unmarketable on that account. The question involved is purely one of law: Where a taxpayer returns 100 per cent. of the income from a lease for taxes, is he entitled to the statutory depletion without diminution on account of a flaw in his title to the lease?

The statute involved, 214 (a) (10), Revenue Act of 1918, directs a reasonable deduction for depletion based upon cost with this proviso:

"Provided further, That in the case of mines, oil and gas wells, discovered by the taxpayer, on or after March 1, 1913, and not acquired as the result of purchase of a proven tract or lease, where the fair market value of the property is materially disproportionate to the cost, the depletion allowance shall be based upon the fair market value of the property at the date of the discovery, or within thirty days thereafter; such reasonable allowance in all the above cases to be made under rules and regulations to be prescribed by the Commissioner with the approval of the Secretary. In the case of leases the deductions allowed by this paragraph shall be equitably apportioned between the lessor and lessee."

The statute dealing with taxable gains on exchange of property, 202 (b), Revenue Act of 1918, requires that property received in exchange shall be treated as cash "to the amount of its fair market value, if any."

The Board took the position that "fair market value" means the same in both sections. That since the title-litigation deprived the stock of market value for the purpose of ascertaining gain on the exchange, it likewise deprived the property of market value for the purpose of allowing for depletion of the oil reserves. But this dry logic leads to such inequitable results, is so opposed to the principle upon which depletion is allowed, and is so contrary to the established practices of the department and the industry, that we are loath to sacrifice substance on its altar.

The two sections in which the phrase is used deal with entirely different questions. In the exchange section, Congress properly enacted that if one received in exchange that which he could readily convert into cash, a taxable gain was realized. If litigation deprived him of a fair market, he had nothing convertible into cash and no taxable gain was realized.

When the same words were used in the depletion section, what did Congress have in mind? Was it concerned with pending litigation which might narrow the market if the owner cared to sell his interest in the lease? Or was it concerned with the diminution of the oil reserves which produced the income? Was Congress thinking of the intrinsic value "of the property" as it said, or was it thinking of whether the owner could market his interest in the lease if so disposed? By the phrase "fair market value of the property" did Congress refer to the market value of the oil exhausted to produce the taxable income, or did it refer to what the owner might get for his interest in the lease if put upon the market?

While an allowance for depletion is a matter of grace and not of right, Darby-Lynde Co. v. Commissioner (C. C. A. 10) 51 F.(2d) 32, Congress has provided therefor, and in construing the words used it is important to ascertain the reason for the enactment. The Supreme Court early held, first under the Corporation Tax Law of 1909, Stratton's Independence v. Howbert, 231 U. S. 399, 34 S. Ct. 136, 58 L. Ed. 285, and then under the Income Tax Law of 1913, Stanton v. Baltic Mining Co., 240 U. S. 103, 36 S. Ct. 278, 60 L. Ed. 546, that the proceeds of minerals mined constituted income and were not the price of a capital asset sold; that while the production of such income resulted in the exhaustion of the ore bodies, Congress was not required to make allowance therefor. When Congress did however provide for a deduction from income because of depletion, we have no doubt the underlying idea was to compensate the owner for the exhaustion of the mineral reserves. Upon this subject the Supreme Court said in United States v. Ludey, 274 U. S. 295, at pages 302, 303, 47 S. Ct. 608, 610, 71 L. Ed. 1054:

"The depletion charge permitted as a deduction from the gross income in determining the taxable income of mines for any year represents the reduction in the mineral contents of the reserves from which the product is taken. The reserves are recognized as wasting assets. The depletion effected by operation is likened to the using up of raw material in making the product of a manufacturing establishment. As the cost of the raw material must be deducted from the gross income before the net income can be determined, so the estimated cost of the part of the reserve used up is allowed. * * * The proviso limiting the amount of the deduction for depletion to the amount of the capital invested shows that the deduction is to be regarded as a return of capital, not as a special bonus for enterprise and willingness to assume risks."

And in Palmer v. Bender, 287 U. S. 551, at page 558, 53 S. Ct. 225, 227, 77 L. Ed. 489:

"Production and sale of the oil would result in its depletion and also in a return of capital investment to the parties according to their respective interests. The loss or destruction of the oil at any time from the date of the leases until complete extraction would have resulted in loss to the partnerships. Such an interest is, we think, included within the meaning and purpose of the statute permitting deduction in the case of oil and gas wells of a reasonable allowance for depletion according to the peculiar conditions in each case."

And in Weiss v. Wiener, 279 U. S. 333, at page 336, 49 S. Ct. 337, 338, 73 L. Ed. 720:

"The diminution in the value of a mine to the lessee is conspicuous, necessary, and intended, and is the very source of the gross income of the lessee from which it is deducted."

The Board did not find there was no fair market value of the oil produced and sold, and of course its sale demonstrated the existence of a market for the product. Depletion was disallowed because there was no market for the leasehold interest. Yet the Supreme Court has held that depletion is measured by the fair market value of the product. We quote from Lynch v. Alworth-Stephens Co., 267 U. S. 364, at page 370, 45 S. Ct. 274, 276, 69 L. Ed. 660:

"There is an exhaustion of property in the one case as in the other; and the extent of it, with the consequent deduction to be made, in each case is to be arrived at in the same way, namely, by determining the aggregate amount of the depletion of the mines in which the several interests inhere, based upon the market value of the product, and allocating that amount in proportion to the interest of each severally considered."

The Commissioner, in arriving at discovery value, makes his computation on the market value of oil. Art. 220 (a) (3), Reg. 45, provides "The 'property' which may be valued after discovery is the 'well.'" The elaborate computations in this record disclose beyond cavil that the Commissioner estimated the value of the oil reserves in the 160 acres around each discovery well; the figures used were the estimated recoveries multiplied by the market value of the oil.

There is other convincing proof that the Commissioner in administering the statute has not considered infirmities in the title of a taxpayer who has reduced the product to possession, sold it on the market, and returned the proceeds for taxation. In this case, on the same day the Commissioner reduced the market value of petitioner's stock 25 per cent. to allow for the title hazard in determining fair market value for exchange, he made no deduc-

tion for the same hazard in arriving at fair market value of the product for depletion. That this accords with the uniform practice, we have no doubt. If the Commissioner, in making depletion allowances, requires taxpayers to furnish abstracts of title, if he must make appropriate reductions for flaws in titles, the books would be full of cases where taxpayers disputed the Commissioner's appraisal of such intangibles. Yet, as far as we are advised, after many years of administration, this is the first instance where depletion has been reduced because of an imperfection in the title.[2] Litigation over titles in the oil fields follows closely and profusely upon the heels of discovery. It is inconceivable that this is the first time a litigated title has been allowed depletion; almost as inconceivable that, if litigation cuts down depletion, no taxpayer has petitioned the Board or the courts to review the Commissioner's estimate of the title hazard. In Solicitor's Opinion, C. B. II-I, p. 104, it was ruled that depletion was allowable to taxpayers producing oil from government land whose title was always clouded and eventually overturned.

That the Commissioner was correct in valuing the product rather than the legal interest of the owner is established by the decision in Palmer v. Bender, supra, where depletion was allowed an assignor who retained no reversionary interest in the oil reserves and had no form of legal interest in the mineral content of the land. The taxpayer returned income from the oil produced, received in payment for his assignment, and was allowed depletion "based on the value of the oil in place."

The rule that income and depletion should go hand in hand seems not only to be the settled and practicable rule, but it is without question the just one. It is stated in the briefs and not denied that petitioner in 1923 requested the Commissioner to treat the income from the lease as impounded pending the litigation over the title, and that the taxes be assessed when ownership was determined. Whether this be so or not, the law is that petitioner was liable for the tax on the income received despite the uncertainty of the litigation. In North American Oil Consol. v. Burnet, 286 U. S. 417, 424, 52 S. Ct. 613, 615, 76 L. Ed. 1197, the Supreme Court dealt with income from oil lands in litigation and held:

"If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent."

Why should petitioner be denied his depletion allowance because he might later be required to account to his adversary for oil produced? Petitioner developed this field in the face of a serious title hazard; he has returned as income the full proceeds of all oil recovered; he must pay his full tax thereon despite the chance that later he might lose it; we see no reason at all why he should be denied depletion because of that hazard. The government loses nothing. If petitioner's title had been clear, concededly he would have been entitled to the depletion allowed by the Commissioner and disallowed by the Board. That he might later be required to account to his adversary in the litigation over the title affords no reason, as we see it, why his taxes should be so greatly increased.

We conclude that the Commissioner was correct in allowing depletion undiminished because the title to the lease was in litigation and that the decision of the Board to the contrary should be reversed.

█ Upon the recomputation, petitioner proposed that he be permitted to withdraw the joint return filed in 1918 for himself and wife, and file a separate return for that year, or to have the taxes for that year assessed as if he and his wife had filed separate returns. This proposal was first made in 1934, long after the time had expired for assessing Mrs. Champlin on her income for that year, a hiatus counsel for petitioner attempts to close by an offer on behalf of Mrs. Champlin, made in one of the late briefs, voluntarily to pay the tax which would have been due if she had filed a separate return. We do not stop to inquire as to the authority so to speak for Mrs. Champlin, for no persuasive reason is advanced why a taxpayer voluntarily filing a joint return in 1918 should be allowed to file an amended separate return in 1934.

---

[2] Although repeatedly challenged so to do, respondent has pointed out no case in the books where depletion has been reduced because of imperfections in the title of the taxpayer, nor of any specific instance where the Commissioner considered such an element.

Section 223, Revenue Act of 1918 (40 Stat. 1074), provided that if husband and wife together have an income of $2,000.00 "each shall make such a return unless the income of each is included in a single joint return." Petitioner elected to file a joint return for 1918.

Section 223 (b), Revenue Act of 1921 (42 Stat. 250), changes the wording somewhat and adds "in which case the tax shall be computed on the aggregate income." These words are of no particular significance here, for under the 1918 act the tax necessarily was assessed on the aggregate income, for such a joint return need only disclose the aggregate income. Under the 1921 law, the Commissioner ruled that where an election was made to file a joint return, an amended return could not be filed on any other basis. I. T. 1372, 1-1, C. B. 228, published June 26, 1922.

Petitioner's contention is that prior to the promulgation of this ruling taxpayers might shift from joint to separate returns without consent of the Commissioner. The argument is based on the change in the wording of the statute, upon the proposition that the Commissioner's ruling changed the law instead of clarifying existing law, and upon a statement in Buttolph v. Commissioner (C. C. A. 7) 29 F. (2d) 695, 696, arguendo, that "It was the practice, also, to permit the filing of amended returns, changing joint to separate and separate to joint returns." We are not concerned with whether that statement of fact found support in that record; suffice it to say there is no support in this record for any such statement.

Congress permitted petitioner to elect to file a joint return for himself and wife. Voluntarily, he so elected. Having done so, we know of no reason in law or equity why he should be permitted to rescind this action without the consent of the Commissioner and without disclosing some reason which would justify a court of equity in setting aside his deliberate act. No reason is suggested now except that in 1934 he discovered that it would have been better if he had not so elected in 1918. To permit taxpayers to change their minds ad libitum for fifteen years would throw the department into inextricable confusion. The general rule is that where a taxpayer has exercised an option afforded by statute he cannot retroactively and ex parte rescind his action. Iron Mountain Oil Co. v. Alexander (C. C. A. 10) 37 F.(2d) 231, certiorari denied 281 U. S. 768, 50 S. Ct.

466, 74 L. Ed. 1175; Ramsey v. Commissioner (C. C. A. 10) 66 F.(2d) 316, certiorari denied Ramsey v. Helvering, 290 U. S. 673, 54 S. Ct. 91, 78 L. Ed. 581; Commissioner v. Moore (C. C. A. 10) 48 F. (2d) 526, certiorari denied Moore v. Burnet, 284 U. S. 620, 52 S. Ct. 8, 76 L. Ed. 528; Howbert v. Norris (C. C. A. 10) 72 F.(2d) 753; Bothwell v. Commissioner (C. C. A. 10) 77 F.(2d) 35; Wheelock v. Commissioner (C. C. A. 5) 77 F.(2d) 474. Nor can the Commissioner be required to assess separately incomes disclosed by a joint return. That is the purpose of separate returns. This record, moreover, does not disclose that the incomes were segregated in the joint return made, so that separate assessment would be feasible. Particularly is this true where the change is sought to be made after the statute of limitations has barred an assessment against the wife. The Board correctly rejected petitioner's proposed recomputation in this regard.

The decision of the Board is modified by restoring the deduction for depletion as originally allowed by the Commissioner.

Modified.